117 P.3d 834

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Dana L. SABOG, Defendant–Appellant.**

**No. 24835.**

Intermediate Court of Appeals of Hawai'i.

March 23, 2005.

Certiorari Granted April 21, 2005.

Certiorari Dismissed as Improvidently Granted Aug. 17, 2005.

Stuart N. Fujioka, Honolulu, on the briefs, for defendant-appellant.

Bryan K. Sano, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

WATANABE, Acting C.J., LIM and FOLEY, JJ.

Opinion of the Court by FOLEY, J.

Defendant–Appellant Dana L. Sabog (Sabog) appeals from the Judgment filed on January 10, 2002 in the Circuit Court of the First Circuit (circuit court).[1] Sabog was convicted of Assault in the Second Degree (Assault Second), in violation of Hawaii Revised Statutes (HRS) § 707–711(1)(d) (1993), and Kidnapping, in violation of HRS § 707–720(1)(e) (1993).[2]

On appeal, Sabog contends (1) the circuit court erred in denying his Motion in Limine and excluding testimony and evidence that the complainant, Tiana Stamm (Stamm), was addicted to methamphetamine, used methamphetamine at or near the time of the alleged kidnapping, had pending felony charges and/or was awaiting sentencing on criminal charges, and was involved in gang activity; (2) the circuit court erred by not instructing the jury that it must unanimously find an act of restraint to support the charge of Kidnapping; and (3) the circuit court erred by denying his motion for a reduced sentence.

## I.

The charges against Sabog arose out of an alleged incident that occurred on or about February 5, 2001. At the February 14, 2001 preliminary hearing on the charges against Sabog, Stamm testified that she was a chronic user of crystal methamphetamine and had

used the drug on February 4, 2001. She also admitted that on the date of the incident, she fell asleep when she was "coming down." On February 20, 2001, Sabog was charged by complaint with Assault Second and Kidnapping.

On September 20, 2001, Sabog filed a Motion in Limine requesting leave of court to introduce (a) evidence of Stamm's drug addiction and use at or near the time of the alleged offense (probative of her reliability, perception and recollection); (b) evidence of Stamm's pending felony prosecutions, her non-appearance in a criminal matter on January 29, 2001, and an issuance of a bench warrant for her failure to comply with supervised release (showing her bias and challenging her credibility); (c) evidence of a trespass order against Stamm prohibiting her from entering Sabog's building and her violations of the order (illustrative of her reputation, character, and credibility); and (d) evidence of Stamm's membership in a group known to steal cars and belongings of others by use of deception (bearing on her credibility).

At the October 16, 2001 hearing on Sabog's Motion in Limine, the circuit court denied Sabog's motion with respect to evidence of Stamm's drug addiction, her pending criminal charges, and her alleged involvement in gang activity. The circuit court limited evidence of Stamm's trespass order and any violation of that order to the date of Sabog's alleged offense.

At trial, Stamm testified that on the evening of February 4, 2001, at around 11:00 p.m., she was "cruising" in a Ford Aerostar van with Jason Ciufo and Genai Faletogo.

1. The Honorable Victoria S. Marks presided.

2. Hawaii Revised Statutes (HRS) § 707–711 (1993) provides in relevant part:
 **§ 707–711 Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:
 . . . .
 (d) The person intentionally or knowingly causes bodily injury to another person with a dangerous instrument[.]
 . . . .
 (2) Assault in the second degree is a class C felony.
 HRS § 707–720 (1993) provides in relevant part:

 **§ 707–720 Kidnapping.** (1) A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to:
 . . . .
 (e) Terrorize that person or a third person[.]
 . . . .
 (2) Except as provided in subsection (3), kidnapping is a class A felony.
 (3) In a prosecution for kidnapping, it is a defense which reduces the offense to a class B felony that the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial.

Immediately after she got in the van, she fell asleep. When Stamm woke up around 3:00 a.m., Sabog and someone she knew as Damage were in the van. The van was not moving, the engine was off, the headlights were off, there were no street lights around, it was dark, and they (Sabog, Damage and Stamm) were in the mountains.

Stamm further testified that Sabog told her to get out of the van. When she refused, he hit her on the head with a black metal flashlight, causing a bump on the left side of her head. Sabog then pulled her out of the van by her arm and tied her wrists in front with a yellow nylon rope. Stamm testified that Sabog said he was going to leave her in the mountains for two days and if she told anybody what happened, they (meaning Sabog and Damage) would "take [her] out." Stamm also testified that Sabog told her he thought she was "working for under cover," meaning he thought she had something to do with his arrest a few weeks before.

Stamm testified that Sabog told her to get back into the van and keep her head under a blanket—which she did. Stamm untied the rope around her wrists while she was under the blanket, but she did not try to escape because "we were driving." Stamm testified that while they were driving around, Sabog told her that since nobody wanted to help her, he would take her in and she could live with him. To make him happy, she agreed. At about 6:00 a.m., Sabog let her out of the van at her friend's house. Sabog gave her his pager number and told her to page him, and she said she would. Stamm testified that Sabog told her not to say anything or "they'll take [her] out."

Honolulu Police Officer Bryson Apo (Officer Apo) testified that on February 6, 2001, while he was talking with Stamm during his investigation on her, he observed that Stamm had fresh cuts on both of her wrists with freshly peeled skin and dried up blood. The cuts looked like burns or lacerations. Officer Apo also observed a bump on top of Stamm's head. Stamm related what had happened and asked to be taken to the emergency room at Wahiawa General Hospital.

Dr. Steven Aglinskas (Dr. Aglinskas) testified that on February 6, 2001 he treated Stamm at Wahiawa Hospital. Stamm complained to him of pain to her wrists and head. Upon examination of her wrists, he observed a partial thickness injury, meaning some of the superficial skin layers were abraded off. He testified that Stamm related to him that the abrasions had occurred two days prior. He noted the injury was consistent with the appearance of an older injury: there was no bleeding, infection, or red streaks. He stated that "this injury that she had was consistent with either heat or an abrasive process that would have caused this sloughing of the superficial skin surface." He could not say whether the injuries were from pressure or heat.

Dr. Aglinskas also examined Stamm's scalp and noted a small bump the size of a quarter. Dr. Aglinskas testified that Stamm mentioned that she was hit on the head with a fist; Dr. Aglinskas also stated that a fist injury is usually much wider. With regard to when the injuries appeared to have occurred, he stated: "Given sort of a window, I'd say one to three days, not—not longer than one day and probably not as long as three days."

Sabog testified that in the early morning hours of February 5, 2001, he was in bed with Leslie Ciufo (Leslie). He denied taking Stamm into the mountains, tying her up, or hitting her on the head with a metal flashlight or with anything else.

Leslie testified that Sabog was her boyfriend and in the early morning hours of February 5, 2001, he was sleeping with her in her son's apartment.

On October 19, 2001, the jury returned its verdict finding Sabog guilty of Assault Second and Kidnapping. On motion by the State, the circuit court sentenced Sabog to mandatory minimum terms of imprisonment pursuant to HRS § 706–606.5 (Supp.2004). The Judgment was filed on January 10, 2002. On January 14, 2002, Sabog filed his notice of appeal.

## II.

### A. Admissibility of Evidence

In *State v. West*, 95 Hawai‘i 452, 24 P.3d 648 (2001), the Hawai‘i Supreme Court stated:

[D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

*Kealoha v. County of Hawaii,* 74 Haw. 308, 319–20, 844 P.2d 670, 676, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993)…. Finally, "the interpretation of the HRE [Hawaii Rules of Evidence] entails a question of law reviewable de novo." *State v. Gano,* 92 Hawaiʻi 161, 166, 988 P.2d 1153, 1158 (1999).

95 Hawaiʻi at 456–57, 24 P.3d at 652–53.

### B. Cross-examination

■ The sixth amendment to the United States Constitution and article I, section 14 of the Hawaiʻi Constitution guarantee a criminal defendant's right to confront adverse witnesses[.] "The Confrontation Clause provides two types of protections for a criminal defendant: the right physically to face those who testify against him [or her], and the right to conduct cross-examination." *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, … 107 S.Ct. 989[, 998] [94 L.Ed.2d 40] (1987). With respect to the latter,

cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only *permitted to delve into the witness' [sic] story to test the witness' [sic] perceptions and memory,* but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.

*Davis v. Alaska,* 415 U.S. 308, 316, … 94 S.Ct. 1105[, 1110] [39 L.Ed.2d 347] (1974).

*State v. Peseti,* 101 Hawaiʻi 172, 179–80, 65 P.3d 119, 126–27 (2003) (emphasis, ellipses, and some bracketed material added).

While the right of cross-examination protected by the Confrontation Clause of the Sixth Amendment may not be unduly restricted, it has never been held that this right is absolutely without restriction. However, the trial court's discretion in exercising control and excluding evidence of a witness's bias or motive to testify falsely becomes operative only after the constitutionally required threshold level of inquiry has been afforded the defendant. *The Sixth Amendment is satisfied where sufficient information is elicited to allow the jury to gauge adequately a witness' [sic] credibility and to assess his or her motives or possible bias.* When the trial court excludes evidence tending to impeach a witness, it has not abused its discretion as long as the jury has in its possession sufficient information to appraise the biases and motivations of the witness.

*State v. Balisbisana,* 83 Hawaiʻi 109, 114, 924 P.2d 1215, 1220 (1996) (internal quotation marks, citations, ellipsis and brackets omitted; emphasis added).

Violation of the constitutional right to confront adverse witnesses is subject to the *harmless beyond a reasonable doubt standard.* In applying the harmless beyond a reasonable doubt standard[,] the court is required to examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction.

*Id.* at 113–14, 924 P.2d at 1219–20 (internal quotation marks and citations omitted; emphasis and bracketed material added).

Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the *importance of the witness' [sic] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.*

*Id.* at 117, 924 P.2d at 1223 (emphasis added) (quoting *Olden v. Kentucky,* 488 U.S. 227, 233, 109 S.Ct. 480, 483–84, 102 L.Ed.2d 513 (1988)).

### C. Jury Instructions—Plain Error

 As a general rule, jury instructions to which no objection has been made at trial will be reviewed only for plain error.... [T]his Court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights.

*State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (citations omitted).

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. If the instructions requested by the parties are inaccurate or incomplete but are necessary in order for the jury to have a clear and correct understanding of what it is that they are to decide, then the trial court has the duty either to correct any defects or to fashion its own instructions.

Nevertheless, the trial court is not required to instruct the jury in the exact words of the applicable statute but to present the jury with an understandable instruction that aids the jury in applying that law to the facts of the case. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. If that standard is met, however, the fact that a particular instruction or isolated paragraph may be objectionable, as inaccurate or misleading, will not constitute ground for reversal. Whether a jury instruction accurately sets forth the relevant law is a question that this court reviews *de novo.*

Furthermore, error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Vanstory,* 91 Hawai'i 33, 42–43, 979 P.2d 1059, 1068–69 (1999) (internal quotation marks, citations, and brackets omitted; block quote format changed).

### III.

### A. Sabog's Motion in Limine

Sabog contends the circuit court erred in denying his Motion in Limine. At the hearing on Sabog's Motion in Limine, the circuit court stated:

THE COURT: Okay. [Sabog's] motion—first motion in limine as to A, that's denied. You'll not be allowed to bring in any drug addiction. I think it goes really to character evidence more than credibility, State versus Sugimoto, and also that there's no expert testimony being—as far as I know—being offered to demonstrate the inference you want drawn.

As to B, pending felony prosecution against Ms. Stamm, there's no prior conviction. Even if there was a prior conviction, it doesn't go to the issue of truthfulness. I'm looking at Rule 404 of Hawaii Rules of Evidence and 403. And even if it went to—to arguably truthfulness, I think there would be undue confusion, waste of time, prejudice to get into it.

Trespass order, I'll allow it. So that's granted.

And her alleged membership in the Spice Girls, that's denied. Again, the reasons that I've previously stated.

### 1. Evidence of Stamm's Drug Addiction and Use At or Near the Time of the Alleged Incident.

Sabog contends the circuit court erred by denying his Motion in Limine to introduce evidence that Stamm was addicted to meth-

amphetamine and used the drug on or near the date in question. He argues evidence of Stamm's drug use on or near the date of the incident bore on her perception, recollection, and reliability. He asserts that evidence of Stamm's drug addiction was admissible because "habitual users of narcotics become habitual liars" and "it shows the witness' [sic] mind, memory, or powers of observation were affected by the habit."

Sabog's arguments are properly divided into two issues. The first issue is whether Stamm's drug addiction and use may be used to attack her reliability. The second issue is whether Sabog may introduce Stamm's drug addiction and use to show its effect upon her perception and recollection.

###### a. The circuit court did not err in declining to allow Sabog to introduce such evidence for purposes of attacking Stamm's veracity or reliability.

 In denying Sabog's Motion in Limine with regard to these issues, the circuit court applied *State v. Sugimoto*, 62 Haw. 259, 614 P.2d 386 (1980). The defendant in *Sugimoto* sought to introduce evidence of a witness's general use of marijuana and possible involvement in the sale of marijuana where there was no mention that the drug was used at the time of the incident. *Id.* at 263, 614 P.2d at 390. The Hawai'i Supreme Court stated that "[a] witness may not be questioned as to his involvement with drugs *solely* to show that he is unreliable or lacks veracity." *Id.* (emphasis added). It is clear that drug addiction and use may not be introduced to attack a witness's general reliability or veracity under *Sugimoto*. Therefore, the circuit court did not err in denying Sabog's motion to introduce such evidence to attack Stamm's reliability or veracity.

###### b. The circuit court committed error by not allowing Sabog to introduce such evidence for purposes of attacking Stamm's perception and recollection.

 Sabog contends he should have been allowed to introduce evidence of Stamm's drug addiction and use to the extent that it bore on her perception and recollection of the alleged event. He argues that "[e]xclusion of this evidence abridged [his] right to confront witnesses under Amendment VI to the U.S. Constitution, Article I, § 14 of the State Constitution, Due Process under Amendment XIV to the U.S. Constitution, Article I, § 5 of the State Constitution."

The State counters that admission of such evidence is precluded by *Sugimoto* and "the question of whether crystal methamphetamine has an effect on a person's 'perception, recollection and reliability' would be a matter involving specialized or scientific knowledge and, thus, should properly be introduced through the testimony of an expert witness in accordance with H.R.E. [Hawaii Rules of Evidence (HRE) ] Rule 702[.]" (Emphasis in original omitted.) The State cites no case other than *Sugimoto* for this proposition and no authority other than HRE Rule 702 that Sabog was required to offer expert testimony on crystal methamphetamine use and addiction to cross-examine Stamm on her use of crystal methamphetamine.

The holding of *Sugimoto* excluded evidence of drug use if used *solely* for the purpose of impeaching veracity and reliability. *Sugimoto* does not resolve the issue of whether Stamm's drug addiction and use were admissible, without expert testimony, to show *the effect on her perception and recollection.* A survey of cases leads us to the conclusion that Sabog was not required to present expert testimony on the effect of crystal methamphetamine to cross-examine Stamm on her crystal methamphetamine addiction and use as it may have affected her perception and recollection of the alleged event. Notably, in these cases, there is a general lack of discussion about experts.

The United States Supreme Court in *Wilson v. United States*, 232 U.S. 563, 34 S.Ct. 347, 58 L.Ed. 728 (1914), concluded that evidence of a criminal defendant's witness's morphine addiction was admissible in the course of cross-examination where

the evidence was not offered or admitted for its bearing upon [witness's] character, but rather to show that [witness] was so much addicted to the use of the drug that the question whether, at the moment of

testifying, [witness] was under its influence, or had recovered from the effects of its last administration, had a material bearing upon [witness's] reliability as a witness. It seems to us that in this aspect the evidence was admissible.

*Id.* at 568, 34 S.Ct. at 349. No expert testimony on morphine addiction was offered.

The United States Court of Appeals for the District of Columbia Circuit in *United States v. Leonard,* 494 F.2d 955 (D.C.Cir. 1974), recognized the propriety of introducing evidence of a witness's habitual heroin use for purposes of attacking the witness's "ability and capacity to observe the events in question." *Id.* at 971. The court, however, agreed with the trial judge, who did not allow the criminal defendants to cross-examine the government's witness on his heroin habit when the government failed to establish the witness used heroin on the day he observed the events that were the subject of his testimony on direct examination. *Id.* at 971–72. The issue of expert testimony on heroin was never raised.

The Seventh Circuit Court of Appeals in *United States v. Cameron,* 814 F.2d 403 (7th Cir.1987), held that a criminal defendant should be allowed to cross-examine the government's witness on the witness's past use of the hallucinogenic drug LSD to challenge the witness's memory. *Id.* at 405. The court did not state that expert testimony was required.

The Appellate Court of Illinois, First District, Third Division, in *People v. Di Maso,* 100 Ill.App.3d 338, 55 Ill.Dec. 647, 426 N.E.2d 972 (1981), held that a criminal defendant can cross-examine a state's witness on the witness's habitual drug use "for purposes of attacking the witness's perception and memory near the time of the events about which he is testifying." *Id.* at 975. The court did not state that expert testimony was required.

The Supreme Court of Wyoming in *Blumhagen v. State,* 11 P.3d 889 (Wyo.2000), held that "[a] witness' [sic] use of drugs while she is testifying or during the events about which she is testifying may, of course, be presented to the jury because the drug use could have affected the witness' [sic] observations or statements." *Id.* at 893. Defendant was, however, precluded from eliciting testimony about the state's confidential informant's drug use because there was no evidence the informant was using drugs while acting as an informant. *Id.*

The Court of Appeals of Maryland in *Lyba v. State,* 321 Md. 564, 583 A.2d 1033 (1991), reversed defendant's conviction because the trial court restricted defendant's cross-examination of the victim to questions as to the victim's alcohol and drug use on the day of the crime. In so ruling, the court wrote:

It is clear that Lyba was entitled, on cross-examination of the victim, to ask whether she had ingested narcotics on the day of the assault and whether she had consumed alcohol on the day she saw Lyba in the park. Those questions went no further than calling for a "yes" or "no" answer. The questions were within the constitutionally required level of inquiry, and, therefore, not subject to limitation. Thus, the questions were proper, and triggered no exercise of discretion on the part of the trial judge.

If the answer to a question were "no" that would be an end to the inquiry on that subject unless Lyba was able to produce evidence, contrary to the denial, which was sufficient to support further inquiry. Judicial discretion and the balancing procedure would come into play only upon further inquiry.

If the answer to a question were "yes," the defense could follow up the admission by delving the degree of drug influence or alcohol intoxication so that the jury could decide the credibility of the victim and how much weight to give her testimony. The propriety of the questions seeking to ascertain the degree to which narcotics or alcohol affected the victim would be subject to the sound discretion of the trial judge, who, in the exercise of that discretion, would be called upon to balance the probative value of the testimony sought against unfair prejudice or harassment which might inure to the victim.

We hold that the trial court's restriction of Lyba's cross-examination of the victim

constituted reversible error. Lyba is entitled to a new trial.

*Id.* at 1036. The court did not state that defendant was required to present expert testimony in order to engage in this cross-examination.

The Supreme Court of Alaska in *Doe v. State,* 487 P.2d 47 (Alaska 1971), ruled it was reversible error to limit defendant's cross-examination of the state's witness's use of LSD. The court ruled that defense counsel should have been allowed to question the witness as to the effects of the drug and whether it was affecting him at the time of the events to which he was testifying at trial. *Id.* at 58. The court did not state that defendant was required to offer expert testimony on LSD.

The Supreme Court of Kansas in *State v. Osby,* 246 Kan. 621, 793 P.2d 243 (1990), held that the trial judge erred in limiting defense counsel's cross-examination of the victim as to her past use of cocaine. In so ruling, the court held:

> For purposes of discrediting a witness, drug-use evidence is admissible to the extent it shows the witness was under the influence of drugs at the time of the occurrence as to which the witness testifies or at the time of trial. It is also admissible to the extent that it shows the witness' [sic] mind, memory, or powers of observation were affected by the habit.

*Id.* at 247. The court did not state that expert testimony on cocaine use was necessary.

In *State v. Carrera,* 528 A.2d 331 (R.I. 1987), the Supreme Court of Rhode Island held that "evidence of use of drugs is admissible *to show that the witness was under the influence of those drugs at the time of the events to which he or she is testifying.*" *Id.* at 333 (emphasis in original). This holding was in an assault-with-intent-to-murder case where the state's witness "admitted that she had been, in the past, a serious drug user but claimed that her drug use was presently limited to a little marijuana 'every now and then' and 'little bit of cocaine.'" *Id.* at 332. When the state's witness testified she was drug-free at the time of the assault, defendant attempted to introduce evidence that

the witness's baby, born the day after the assault, was "addicted" to drugs. *Id.* This evidence was not allowed without expert testimony establishing the link between the "addicted" infant and any drug use of the mother. *Id.* at 334. Expert testimony, however, was not required, or raised, in defendant's cross-examination of the witness concerning her drug use near the time of the assault.

The Supreme Court of Florida in *Edwards v. State,* 548 So.2d 656 (Fla.1989), held that evidence of the state's witness's past drug use, including heroin, where the witness had been clean for the past several years, was not admissible in cross-examination by the defendant without expert testimony of the effect of the past drug use on the witness's memory and perception. *Id.* at 656–58. The court distinguished this situation from one where a witness took drugs at or about the time of the incident, which would not require expert testimony to impeach the state's witness. *Id.* at 658.

Sabog was entitled to cross-examine Stamm as to her drug use and addiction at or near the time of the incident to the extent that it affected her perception or recollection of the alleged event, and Sabog was not required to present expert testimony to that effect. The circuit court erred in denying Sabog's Motion in Limine in this respect.

**2. Evidence of Stamm's Pending Felony Charges.**

 Sabog contends the circuit court erred by denying his Motion in Limine requesting the introduction of Stamm's guilty pleas and pending sentencing in two felony cases, as well as her January 29, 2001 nonappearance in another criminal proceeding and the issuance of a bench warrant for her failure to comply with supervised release. Sabog argues that

> [e]xclusion of this evidence abridged defendant's right to confront witnesses under Amendment VI to the U.S. Constitution, Article I, § 14 of the State Constitution, Due Process under Amendment XIV to the U.S. Constitution, Article I, § 5 of the

State Constitution and is repugnant to Hawaii Rule[s] of Evidence [Rule] 609.1.[3]

(Footnote added.)

The State contends the circuit court properly denied Sabog's Motion in Limine because "[a]bsent evidence that there was a plea agreement or deal between the State and Stamm in her pending cases, [Sabog] failed to support his contention that the mere fact that Stamm was awaiting sentencing would somehow color her testimony."

Sabog argues that even without an agreement or deal between Stamm and the State, such evidence should have been allowed to test for bias. He cites *Commonwealth v. Cobb*, 409 Pa.Super. 168, 597 A.2d 714 (1991), for its holding that

> whenever a prosecution witness may be biased in favor of the prosecution because of outstanding criminal charges or because of any non-final criminal disposition against him within the same jurisdiction, that possible bias, in fairness, must be made known to the jury. Even if the prosecutor has made no promises, either on the present case or on other pending criminal matters, the witness may hope for favorable treatment from the prosecutor if the witness presently testifies in a way that is helpful to the prosecution. And if that possibility exists, the jury should know about it.

*Id.* at 715 (quoting *Commonwealth v. Evans*, 511 Pa. 214, 512 A.2d 626, 631–32 (1986)).

The United States Supreme Court has concluded that evidence of a witness's probation status and a witness's detention pending criminal charges is admissible to explore the possible biases, prejudices, or motives of a witness to testify. *Davis v. Alaska*, 415 U.S. 308, 316–18, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974); *Alford v. United States*, 282 U.S. 687, 693, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931).

Other courts, addressing whether evidence that a State's witness has pending criminal charges or is awaiting sentencing is admissible, have concluded that such evidence is admissible to show possible bias or motive

for testifying. *See Bellew v. Gunn*, 424 F.Supp. 31, 40–41 (N.D.Cal.1976) (concluding where the pendency of criminal charges may serve to bias a witness's testimony, evidence is admissible for the narrow purpose of suggesting such bias); *Jenkins v. United States*, 617 A.2d 529, 532 (D.C.1992) (concluding guilty pleas prior to sentencing may be properly explored in most bias inquiries); *Miller v. State*, 741 S.W.2d 382, 389 (Tex.Crim.App. 1987) (concluding evidence that a witness, who testifies against the accused, is awaiting sentencing is always admissible against the witness to show a possible motive for testifying ·for the State and against the accused); *State v. Baker*, 133 N.J.Super. 398, 336 A.2d 762, 764 (1975) (concluding it is for the jury to consider a witness's upcoming sentencing and to evaluate any hopes of leniency or any fears of stringent treatment the witness may have as a consequence of his/her testimony); and *Watts v. State*, 450 So.2d 265, 268 (Fla. Dist.Ct.App.1984) (concluding impeachment of a key witness concerning the fact the witness is awaiting sentencing for some offense and might have some expectation of leniency is permissible to demonstrate the witness's bias or motive for testifying).

We are persuaded that even in the absence of an agreement, Stamm's pending sentencing in two other criminal matters was relevant and probative of a potential bias or motive for testifying in favor of the State. The circuit court's denial of Sabog's Motion in Limine with respect to this issue prevented Sabog from introducing any evidence of Stamm's potential bias or motive for testifying. We conclude that the jury did not have "in its possession sufficient information to appraise the biases and motivations of the witness." *Balisbisana*, 83 Hawai'i at 114, 924 P.2d at 1220. Therefore, the circuit court erred in denying Sabog's Motion in Limine with respect to evidence of Stamm's pending sentencing.

### 3. The Errors Were Not Harmless Beyond a Reasonable Doubt.

▮ The circuit court's errors were not harmless beyond a reasonable doubt. As stated in *Balisbisana:*

> witness may be attacked by evidence of bias, interest, or motive."

---

3. Hawaii Rules of Evidence (HRE) Rule 609.1 states, in relevant part, that "[t]he credibility of a

Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. *These factors include the importance of the witness' [sic] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.*

*Balisbisana*, 83 Hawai'i at 117, 924 P.2d at 1223 (emphasis added).

Stamm's testimony was essential to the State's case. There was no other evidence presented that could place Sabog with Stamm at the time of the alleged kidnapping or confirm the source of Stamm's injuries. Both Sabog and Leslie testified that Sabog was sleeping with Leslie during the time of the alleged kidnapping. Dr. Aglinskas, when asked whether he could tell whether Stamm's injuries were from pressure or heat, stated "[n]o. It's—this was a—just a—a partial thickness injury. Whether it was an abrasion or a heat generated thing, I don't think the—we could really tell." Sabog was not permitted to cross-examine Stamm about whether her drug addiction and use on or near the time of the incident affected her perception or her recollection of the events. Sabog was also not permitted to cross-examine Stamm about any possible bias or motive for testifying for the State. While the State's case was not weak, it was based on the jury finding that Stamm's testimony was credible and believing Stamm over Sabog. Like *Balisbisana*, there was a reasonable possibility that the errors complained of contributed to Sabog's conviction. We conclude the circuit court's errors were not harmless beyond a reasonable doubt, and, accordingly, we must vacate Sabog's convictions.

#### 4. Evidence of Stamm's Alleged Involvement with Gang Activity.

■ Sabog contends the circuit court erred by excluding evidence of Stamm's al-

leged involvement with gang activity. Since Sabog was unable to present evidence of Stamm's drug use or potential bias from pending charges, he argues such evidence was admissible, under HRE Rules 404 and 405, so the jury could adequately gauge Stamm's credibility. The State counters that HRE Rule 608 only allows evidence going to character for untruthfulness and Sabog failed to establish how evidence of gang membership was relevant to Stamm's character for untruthfulness.

Hawaii Rules of Evidence Rule 404 (Supp. 2004) states in relevant part:

> **Rule 404. Character evidence not admissible to prove conduct; exceptions; other crimes.** (a) Character evidence generally. Evidence of a person's character or a trait of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> . . . .
>
> (3) Character of witness. Evidence of the character of a witness, as provided in rules 607, 608, 609, and 609.1.[4]

(Footnote added.) Rule 405 states in relevant part:

> **Rule 405. Methods of proving character.** (a) Reputation or opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

Rule 608 states in relevant part:

> **Rule 608. Evidence of character and conduct of witness.** (a) Opinion and reputation evidence of character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations:
>
> (1) The evidence may refer only to character for truthfulness or untruthfulness, and

---

**4.** HRE Rule 607 defines who may impeach the credibility of a witness. HRE Rule 609 allows for impeachment by evidence of a prior criminal conviction when the crime involves dishonesty. HRE Rule 609.1 allows for impeachment by evidence of bias, interest or motive.

(2) Evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

The plain language of HRE Rule 404 indicates that evidence of a witness's character is admissible as provided in HRE Rules 607, 608, 609 and 609.1. The plain language of HRE Rule 608 indicates that the credibility of a witness may be attacked by opinion or reputation evidence *only* if it refers to the witness's character for truthfulness or untruthfulness. Sabog does not explain how Stamm's alleged involvement in gang activity goes to the issue of truthfulness, and this court cannot find any plausible link between them. We conclude the circuit court did not err in excluding evidence of Stamm's alleged involvement in a gang.

### B. Specific Unanimity Jury Instruction for Offense of Kidnapping

Sabog contends the circuit court plainly erred by not instructing the jury that "it must unanimously find an act of restraint to support the charge of kidnapping." Sabog asserts that "more than one alleged act of restraint could have supported the kidnapping charge" because "[t]he State argued that [Stamm] was forced out of the van, hit on the head, tied up and kept in the van while it was moving."

The Hawai'i Supreme Court stated in *State v. Rapoza*, 95 Hawai'i 321, 22 P.3d 968 (2001), that

so long as an offense is not statutorily defined in such a manner as to provide that the requisite conduct element cannot be satisfied by a series of acts constituting a continuous course of conduct, the danger present in [*State v.* ]*Arceo*[, 84 Hawai'i 1, 928 P.2d 843 (1996) ]—*i.e.,* jury confusion regarding the facts constituting the conduct element of an offense—does not arise where the prosecution alleges that the defendant committed but one offense, adduces evidence that the defendant engaged in a series of acts constituting a continuous course of conduct, and argues that the requisite conduct element is satisfied by the defendant's continuous course of conduct, albeit that the defendant's continuous course of conduct may be divisible into conceptually distinct motor activity.

*Id.* at 330, 22 P.3d at 977.

Additionally, in *State v. Apao,* 95 Hawai'i 440, 24 P.3d 32 (2001), the court, in examining whether a specific unanimity instruction was necessary in an unlawful imprisonment case, stated:

[N]othing in the statutory definition of the offense [of unlawful imprisonment] precludes the prosecution from proving that the restraint was accomplished by a series of acts constituting a course of conduct. *It is not difficult to imagine a series of threats and coercive conduct that might be employed to sustain a kidnapping or unlawful restraint over a period of time.* Moreover, this court has previously stated that, *under certain circumstances, kidnapping would be an example of a continuing offense.*

*Id.* at 448, 24 P.3d at 40 (emphasis added). In light of the supreme court's discussions in *Apao* and *Rapoza,* it is evident that where a series of threats and coercive conduct are employed to sustain a kidnapping over a period of time, a court is not required to give a specific unanimity jury instruction.

In the State's closing argument, with regard to the restraint aspect of the kidnapping, the State argued:

[W]e have a definition of restrain, basically means restrict movement substantially by force or threat, Tianna Stamm. Did he restrain her? The answer is "yes." How did he restrain her? Well, he hit her when she tried to resist him. She didn't want to go there, wham. There's your force right there.

Dragged her out of the van. She didn't want to get out of that van. She was in an isolated area, no buildings, no lighting, up in the mountains. She did not want to get out of there. How did he get her out of there? He used force. He dragged her out. What did he do? He tied hands tight enough to burn the hands, the friction burns. He tied her up. He was again using force.

And he did not let her go when she begged to. He knew she wanted to go. So the answer to the first one is "yes," he used restraint.

The acts of hitting Stamm on the head, dragging her out of the van, and tying up her hands were all part of Sabog's attempt to prevent Stamm from leaving when she wanted to leave. It is apparent that the State was presenting Sabog's actions as a single continuing course of restraint "set on foot by a single impulse and operated by an unintermittant [sic] force with one general intent and one continuous plan." *Apao*, 95 Hawai'i at 451, 24 P.3d at 43 (internal quotation marks, citation, brackets, and ellipsis omitted).

Under the circumstances, the circuit court was not required to give a specific unanimity instruction with regard to an act of restraint for the Kidnapping charge. The circuit court did not commit plain error by not providing the jury with a specific unanimity instruction.

### C. Sabog's Sentence

Sabog contends his sentence to a mandatory term of incarceration as a repeat offender denies him equal protection of the laws as guaranteed by the Fourteenth Amendment of the United States Constitution and Article I, § 5 of the Hawai'i Constitution. Since we conclude the circuit court committed reversible error in prohibiting evidence of Stamm's drug addiction and use and her pending felony charges, we do not address this claim.

### IV.

The Judgment filed on January 10, 2002 in the Circuit Court of the First Circuit is vacated and this case is remanded with instructions for a new trial.

