144 P.3d 584

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Matthew RYAN, Defendant–Appellant.**

**No. 26585.**

Intermediate Court of Appeals of Hawai'i.

July 5, 2006.

Mary Ann Barnard, on the briefs, for Defendant–Appellant.

Daniel H. Shimizu, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

BURNS, C.J., FOLEY, and NAKAMURA, JJ.

Opinion of the Court by NAKAMURA, J.

Defendant–Appellant Matthew Ryan (Ryan) appeals from the Judgment filed on May 10, 2004, in the Family Court of the First Circuit (family court).[1] Ryan was charged by complaint with Abuse of a Family or Household Member, in violation of Hawaii Revised Statutes (HRS) § 709–906 (Supp. 2005)[2] (Count 1); Violation of an Order for Protection, in violation of HRS §§ 586–5.5 and 586–11(a)(1)(B) (Supp.2005)[3] (Count 2);

1. The Honorable Reynaldo D. Graulty presided.

2. Hawaii Revised Statutes (HRS) § 709–906 (Supp.2005) provides, in relevant part, that "[i]t shall be unlawful for any person, singly or in

concert, to physically abuse a family or household member...."

3. HRS § 586–5.5 (Supp.2005) provides, in relevant part:

and Terroristic Threatening in the Second Degree (Terroristic Threatening II), in violation of HRS §§ 707–715 and 707–717(1) (1993)[4] (Count 3). A jury found Ryan guilty as charged on all counts. Ryan was sentenced to a term of imprisonment of one year, which was stayed pending appeal.

On appeal, Ryan argues that: 1) the family court erred in allowing two police officers to give their opinions on the credibility of the complaining witness; 2) the manner in which the Deputy Prosecuting Attorney (DPA) questioned witnesses constituted prosecutorial misconduct; 3) Ryan's trial counsel provided ineffective assistance; 4) the family court erred in refusing to permit Ryan to use information in police reports relating to the complaining witness's bias and motive to falsely accuse Ryan; 5) the family court committed plain error in failing to give a specific unanimity instruction with respect to the Terroristic Threatening II charge and a merger instruction with respect to the Abuse of a Family and Household Member and the Terroristic Threatening II charges; and 6) the charge of Violation of an Order for Protection must be dismissed because the Order For Protection does not contain a "jurisdictional finding" that Ryan and the complaining witness were family or household members. We vacate the Judgment and remand the case for a new trial.

(a) If, after hearing all relevant evidence, the court finds that the respondent has failed to show cause why the order should not be continued and that a protective order is necessary to prevent domestic abuse or a recurrence of abuse, the court may order that a protective order be issued for a further fixed reasonable period as the court deems appropriate.

HRS § 586–11(a) (Supp.2005), in turn, provides, in relevant part:

Whenever an order for protection is granted pursuant to this chapter, a respondent or person to be restrained who knowingly or intentionally violates the order for protection is guilty of a misdemeanor.

4. HRS § 707–715 (1993) provides, in relevant part:

A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person or serious damage to property of another or to commit a felony:

## BACKGROUND

The complaining witness (CW) was Ryan's niece. Ryan, the CW, and the CW's teenage son had been living with Ryan's parents until the CW obtained an Order for Protection (Protection Order) against Ryan on May 12, 2003. The Protection Order required Ryan's parents to decide whether the CW or Ryan would be required to vacate the premises. Ryan's parents decided that the CW would remain and that Ryan would move out. The Protection Order remained in effect through May 12, 2005.

The CW testified that on June 17, 2003, at about 4:15 a.m., she returned home with her boyfriend after a night of shooting pool and spending time at a karaoke lounge. The CW's boyfriend decided to stay the night but first left to switch cars with a family member. After the boyfriend left, the CW went into the bathroom to get ready for bed.

According to the CW, Ryan suddenly opened the bathroom door and attacked her. Ryan struck the CW around the head and shoulders causing her to back away and fall into a bathtub, where the beating continued. During the assault, Ryan repeatedly yelled, "do [you] know what [you've] done[?] I should kill you[.]" The CW screamed for her grandfather, but no one responded. When Ryan stopped hitting the CW, he picked up a stool and threw it at her as he left the bathroom.

(1) With the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]

HRS § 707–717 (1993) provides, in relevant part:

A person commits the offense of terroristic threatening in the second degree if the person commits terroristic threatening other than as provided in section 707–716."

HRS § 707–716 (1993) provides, in relevant part:

(1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:

(a) By threatening another person on more than one occasion for the same or a similar purpose; or

(b) By threats made in a common scheme against different persons; or

(c) Against a public servant . . . ; or

(d) With the use of a dangerous instrument.

The CW called 911 from the house but was unable to get through, so she ran to a park about a block and a half away and called 911 again from a pay phone. The recording of the 911 call was admitted in evidence. The CW told the 911 dispatcher that her uncle, "Matt Ryan," had just assaulted her. Police officers and an ambulance met the CW at the park. The officers later went to the CW's home but did not see Ryan there.

Ryan's father, who acknowledged having a hearing impairment, testified that he did not hear any disturbance or see Ryan at his home on the morning of the alleged assault. Ryan's father stated that he would certainly have heard someone yelling or pounding on the wall.

Ryan testified in his own defense at trial. Ryan did not dispute that the CW had been assaulted by someone and had suffered injuries. However, Ryan maintained that he had not been the person who assaulted the CW.[5]

## DISCUSSION

### I.

Ryan argues that the family court abused its discretion in permitting two police officers to give their opinions on the CW's credibility with respect to her allegations against Ryan. "Evidentiary rulings are reviewed for abuse of discretion, unless application of the rule admits of only one correct result, in which case review is under the right/wrong standard." *State v. Ortiz*, 91 Hawai'i 181, 189, 981 P.2d 1127, 1135 (1999) (internal quotation marks and citations omitted).

### A.

The State of Hawai'i (the State) called Honolulu Police Department (HPD) Officers Kevin Ancog (Officer Ancog) and Michael Thompson (Officer Thompson) as witnesses. Officer Ancog was the first police officer to meet with the CW at the park. He took a statement from the CW and also accompanied the CW back to her home where he continued his investigation. Officer Thompson also met with the CW at the park. Officer Thompson overheard the CW's conversation with Officer Ancog, and Officer Thompson participated in the investigation at the CW's home.

During the DPA's direct examination of Officer Ancog, the following took place:

[DPA]: And, Officer, after you completed your investigation, did you have any reason not to believe what Ms. Ryan told you?

[RYAN'S COUNSEL]: Objection, your Honor, it's speculation.

THE COURT: I'll sustain the objection.

[DPA]: Was there any evidence to make you disbelieve what Ms. Ryan told you?

[OFFICER ANCOG]: No.

[RYAN'S COUNSEL]: Same objection, your Honor.

THE COURT: I'll sustain the objection.

[DPA]: Your Honor, may we approach?

THE COURT: Counsel will approach. Would the witness please step away momentarily.

### (Bench Conference)

. . . .

THE COURT: I think the problem is, the form of the question is, it kine'a calls for a conclusion rather then [sic] asking him specifically. I guess the second part of the question was was there anything to indicate might not be consistent with what the version or the story was that the witness told her, told him. I think that's closer to the mark.

The objection was on the same basis as the first one which is specifically that it called for a legal conclusion.

[RYAN'S COUNSEL]: Yes, your Honor.

THE COURT: It's not even a legal conclusion. It calls for a conclusion on the part of the witness.

---

5. In closing argument, the attorney for Defendant–Appellant Matthew Ryan (Ryan) suggested that the complaining witness (CW) had been assaulted by her boyfriend and had falsely accused Ryan to conceal what the boyfriend had done from the CW's grandparents.

—indiscernible—

THE COURT: I think you need to lay a little bit more foundation as to the number of cases in which he has been involved in and whether or not based on his experience, et cetera, et cetera, et cetera, but I think you need more foundation before you'll be allowed to ask that question. So, I'll sustain the objection on that basis.

. . . .

**(End Bench Conference)**

THE COURT: You may continue, [DPA]. Please rephrase the question.

[DPA]: Officer Ancog, what type of training have you received at HPD in regards to investigating domestic violence types of cases?

[OFFICER ANCOG]: Well, we were trained as far as the complainant's demeanor. Kine'a basically look at the overall situation, take everything into account. I mean, we don't just go in there necessarily taking anyone's word, you know, for face, you know, as face value (indiscernible) investigation, find the facts.

[DPA]: And how many, while working at HPD, how many domestic violence cases have you responded to?

[OFFICER ANCOG]: Many. I don't know a specific amount, but.

[DPA]: Can you give an approximate number of cases that you've responded to?

[OFFICER ANCOG]: Anywhere from, maybe about twenty or thirty.

[DPA]: And in those cases, you do a similar type of investigation?

[OFFICER ANCOG]: Yes.

[DPA]: And what would that normally entail?

[OFFICER ANCOG]: Well, you talk to the complainant to find out what happened exactly, circumstances that were involved. We find out, especially if it's about the alleged, you know, suspect, as far as their living condition, if they had children together. There're certain criteria that's involved in order to determine whether or not it would be classified as an assault as compared to domestic violence type situation.

[DPA]: And based upon your training and experience and after completion of your investigation at [the CW's residence], was there any evidence that made you not believe what [the CW] had told you had happened?

[OFFICER ANCOG]: No.

During the DPA's direct examination of Officer Thompson, the following questions were asked and answers given:

[DPA]: Officer have you received training in domestic violence type of cases?

[OFFICER THOMPSON]: Yes, sir.

[DPA]: What type of training is this?

[OFFICER THOMPSON]: Through the academy.

[DPA]: And where is the academy?

[OFFICER THOMPSON]: In Waipahu.

[DPA]: And what type of training did you receive?

[OFFICER THOMPSON]: We received, we had victim's advocacy. People would come in and talk to us about domestic violence type cases. We had—

[DPA]: So, you just basic procedures in conducting an investigation?

[OFFICER THOMPSON]: Yes, sir.

[DPA]: And that would entail talking to witnesses?

[OFFICER THOMPSON]: Yes, sir.

. . . .

[DPA]: How many domestic violence types of cases have you conducted?

[OFFICER THOMPSON]: Conducted—

[DPA]: Within your five years of (indiscernible)?

[OFFICER THOMPSON]: Maybe twenty.

[DPA]: And after you completed the investigation or the investigation of the home, did you have any reason not to believe what [CW] told you was true?

[OFFICER THOMPSON]: No, I didn't.

[DPA]: And why was this?

[OFFICER THOMPSON]: Her story was consistent with what had happened in the house as far as the condition of the

bathroom, the condition of her injuries and her emotional state.

[DPA]: And this was based upon your training and experience?

[OFFICER THOMPSON]: Yes, sir.

The DPA returned to the same line of inquiry during his redirect examination of Officer Thompson:

[DPA]: And, the point I'm trying to get at is that even though [Ryan's father], told you that he didn't see or hear anything, you testified that [the CW] told you what happened and that you observed the condition of the bathroom, even he told you that he didn't see or hear anything, did you have reason to believe that [the CW] was lying?

[RYAN'S COUNSEL]: Objection, your Honor, calls for speculation.

THE COURT: I'll overrule the objection. Please answer the question.

[OFFICER THOMPSON]: I had no reason to believe that she was lying.

On recross-examination, Officer Thompson acknowledged that it was the CW who said that Ryan was involved in the assault and that there was no other witness to the incident. On re-redirect, the DPA elicited the following:

[DPA]: [The CW's] testimony and what you observed was consistent with her being beaten by her uncle, Matthew Ryan, in the bathroom?

[OFFICER THOMPSON]: Correct.

[RYAN'S COUNSEL]: Asked and answered, asked and answered previously, your Honor.

[THE COURT]: It's been asked and answered. Are you saying it's preliminary to something else, [DPA]?

[DPA]: This is re-redirect. He was asked if it was, if it was consistent with her being beaten. I just wanted to clarify.

THE COURT: I'm gonna move that it's been asked and answered. Anything further?

[DPA]: Nothing further, your Honor.

THE COURT: Alright, very well, thank you very much. Thank you, Officer, you're excused.

### B.

The prosecution is entitled to elicit evidence which shows that matters uncovered by the police during its investigation were consistent with a complaining witness's version of what happened. In Ryan's case, for example, the State properly introduced evidence of the CW's injuries as observed by the police officers, their discovery of the bathroom in disarray, and the CW's distraught and emotional state when she reported the alleged offenses to the officers. Based on such evidence, the State was free to argue that evidence uncovered during the police investigation corroborated the CW's version of what happened.

■ On the other hand, it is generally improper for a witness to express an opinion on the truthfulness of a complaining witness's allegations. *See In the Interest of Doe*, 70 Haw. 32, 40, 761 P.2d 299, 304 (1988). Such testimony may impermissibly invade the province of the jury to determine the credibility of witnesses and determine the facts. *See State v. Maluia*, 107 Hawai'i 20, 24, 108 P.3d 974, 978 (2005) (holding that it is improper for the prosecution to ask the defendant to comment on another witness's veracity).

In *State v. Batangan*, 71 Haw. 552, 799 P.2d 48 (1990), a clinical psychologist, with a subspecialty in the treatment of sexually abused children, "implicitly testified that Complainant was believable and that she had been abused by Defendant." *Id.* at 554–55, 799 P.2d at 50. The Hawai'i Supreme Court held that the trial court had erred in permitting this expert testimony. *Id.* at 558–63, 799 P.2d at 52–54. Our supreme court quoted with approval language from a decision of the Arizona Supreme Court which stated, "[W]e do not believe the jury needs an expert to explain that the victim's behavior is consistent or inconsistent with the crime having occurred." *Id.* at 558, 799 P.2d at 52 (quoting *State v. Moran*, 151 Ariz. 378, 728 P.2d 248, 255 (1986)). The Hawai'i Supreme Court concluded that "[t]he jury is fully capable, on its own, of making the connections to the facts of the particular case before them

and drawing inferences and conclusions therefrom." *Id.*

The court noted that while Hawaii Rules of Evidence (HRE) Rule 704 (1993) permits opinion testimony on even the ultimate issue to be decided by the trier of fact, the rule does not allow " 'the admission of opinions which would merely tell the jury what result to reach.' " *Id.* at 559, 799 P.2d at 52 (quoting the Commentary to HRE Rule 704). The court concluded that "where the effect of the expert's opinion is 'the same as directly opining on the truthfulness of the complaining witness,' such testimony invades the province of the jury." *Id.* (citation omitted) (quoting *State v. Myers,* 382 N.W.2d 91, 97 (Iowa 1986)).

The Hawai'i Supreme Court's reasons for condemning the expert's testimony in *Batangan* applies to the officers' testimony in Ryan's case. It is true that the DPA did not directly ask Officers Ancog and Thompson for their opinion on whether the CW had told them the truth. The questions posed to the officers were couched in terms of whether they had any reason or evidence that would cause them not to believe the CW's allegations against Ryan. The officers testified that they had no reason or evidence to disbelieve the CW's allegations. However, given the DPA's repeated questioning on this subject and the context in which the questions were asked, the only purpose served by the questioning was to inject into the trial the officers' opinion that the CW's allegations were true. Officer Ancog and Officer Thompson had already testified about the evidence each had observed and gathered in the investigation before the DPA elicited the testimony challenged on appeal. Viewed in context, the effect of the officers' testimony was the same as a direct expression of their opinion that the CW had told them the truth. *See id.* at 559, 799 P.2d at 52.

The emphasis on the officers' training and experience in domestic violence cases served to give the officers an aura of being experts in evaluating the truthfulness of statements made by an alleged victim in domestic violence cases. This magnified the danger that the officers' testimony would have an undue influence on the jury. We conclude that the officers' testimony, which was tantamount to an expression of their opinion that the CW had been truthful in accusing Ryan, impermissibly invaded the province of the jury. *See id.* at 559–63, 799 P.2d at 52–54. Accordingly, under the circumstances of this case, we hold that the family court abused its discretion in permitting such testimony.

The State acknowledges that the testimony of Officers Ancog and Thompson "appears suggestive" that they found "[the CW's] account of the assault to be believable." It argues, however, that the officers' opinions "were directed more toward the completeness of the police investigation." We disagree. There may be circumstances in which an officer's belief in a complaining witness's allegations would be relevant and admissible to explain the officer's actions in conducting the investigation. But this is not such a case. The defense did not attack the actions of Officers Ancog and Thompson or the thoroughness of the HPD's investigation. The context in which the officers were questioned convinces us that the officers' testimony was directed at whether they believed the CW was truthful in her allegations and not at the thoroughness of their investigation.

We also conclude that the error in permitting the officers to testify about the CW's credibility in accusing Ryan affected Ryan's substantial rights. The CW was the only eyewitness to the alleged attack. No one else placed Ryan at the house when the alleged attack occurred. Ryan denied being the perpetrator. The case therefore turned on the jury's assessment of whether the CW or Ryan was more credible on the question of whether Ryan had been the perpetrator. Under the facts of this case, we cannot say that the error was harmless beyond a reasonable doubt. All the charges against Ryan were based on the same alleged incident. We therefore vacate Ryan's convictions on all counts and remand for a new trial.

## II.

Our determination that a retrial is required because of the error in admitting the officers' improper testimony makes it unnecessary for us to resolve Ryan's claims of

**142**

prosecutorial misconduct and ineffective assistance by his trial counsel. We also decline to address Ryan's contention that the family court committed plain error in failing to give unanimity and merger instructions to the jury. During the retrial, the parties may present their arguments regarding the appropriate jury instructions to the family court and give it the opportunity to rule.

Ryan claims that the family court made a "blanket ruling" that he could not use the CW's prior acts to demonstrate her bias against Ryan or her motive to fabricate the charges against him. Ryan, however, does not provide a citation to where in the record this blanket ruling was supposedly issued. Nor did our review of the record reveal a blanket ruling by the family court that precluded Ryan from attacking the CW's credibility through evidence of her bias or motive as permitted by HRE Rule 609.1 (1993). We therefore are unable to address this claim. *See* Hawaiʻi Rules of Appellate Procedure (HRAP) Rule 28(b)(4) (requiring that each point of error on appeal state "where in the record the alleged error occurred"); *see also State v. Hoang*, 93 Hawaiʻi 333, 336, 3 P.3d 499, 502 (2000) (concluding that the court had no basis to rule on the merits of the appellant's claim when the factual basis for appellant's alleged point of error was not part of the record on appeal).

Finally, we reject Ryan's claim that the Protection Order was invalid for failing to contain a "jurisdictional finding" that Ryan and the CW were family or household members. Ryan cites no authority for the proposition that an order for protection must contain a jurisdictional finding to be valid. In any event, the Protection Order states that "[t]he Court has jurisdiction over the parties." In addition, Ryan testified at his criminal trial that the CW was his niece and that they had formerly resided together at the home of Ryan's father. This testimony established that the CW and Ryan met the definition of "family or household member" under HRS § 586-1 (Supp.2005) both as "persons related by consanguinity" and as "persons ... formerly residing in the same dwelling unit." Accordingly, the family court had jurisdiction to issue the Protection Order under HRS § 586-5.5, and the Protection Order was valid.

## CONCLUSION

We vacate the May 10, 2004, Judgment of the Family Court of the First Circuit and remand the case for a new trial, consistent with this opinion, on all counts.

