*** FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER ***

Electronically Filed
Supreme Court
SCWC-29550
14-FEB-2014
01:49 PM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

—--oOo---

_____

STATE OF HAWAIʻI, Respondent/Plaintiff-Appellee,

vs.

ENRICO CALARA, Petitioner/Defendant-Appellant.
_____

SCWC-29550

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(ICA NO. 29550; CR. NO. 08-1-0977)

FEBRUARY 14, 2014

ACOBA, McKENNA, AND POLLACK, JJ.; WITH RECKTENWALD, C.J.,
CONCURRING & DISSENTING, WITH WHOM NAKAYAMA, J., JOINS

AMENDED OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

In this appeal, Petitioner/Defendant-Appellant Enrico Calara

challenges multiple evidentiary determinations by the Circuit

Court of the First Circuit ("circuit court").[1]  Calara was

convicted of sexual assault in the fourth degree, in violation of

_____

[1]     The Honorable Reynaldo D. Graulty presided.

Hawaiʻi Revised Statutes ("HRS") § 707-733(1)(a) (1993),[2] for allegedly fondling the breast of the Complaining Witness ("CW"), his adult niece, while she slept. On certiorari, Calara presents five questions:

> 1. Whether the ICA gravely erred in holding that Calara's right to present a complete defense was not violated when the circuit court precluded him from introducing evidence of the complainant's drug pipe and by cross-examining the complain[an]t about her drug use for the purposes of attacking her perception and recollection.
> 2. Whether the ICA gravely erred in deciding the issue of whether the circuit court erred in admitting the police detective's testimony that probable cause was established to arrest Calara for sexual assault in the fourth degree under the plain error standard of review and in failing to hold that the testimony was irrelevant and improper.
> 3. Whether the ICA gravely erred in concluding that the admission of CW's statement to [her aunt,] Theresa Nishite as an "excited utterance" was harmless beyond a reasonable doubt.
> 4. Whether the ICA gravely erred in concluding that the evidence of Calara's prior statements uttered in January 200[7] and February 200[7] to establish his intent were relevant.
> 5. Whether the ICA gravely erred in holding that the circuit court's failure to provide a limiting instruction at the time of CW's testimony regarding Calara's alleged prior statements and as part of the final charge to the jury was not plain error.

We conclude that the second question presented requires vacating Calara's conviction and remanding his case for a new trial. We hold that the circuit court abused its discretion by admitting the testimony of a police detective, a long-time

---

[2] HRS § 707-733(1)(a) provides, "A person commits the offense of sexual assault in the fourth degree if: . . . [t]he person knowingly subjects another person to sexual contact by compulsion or causes another person to have sexual contact with the actor by compulsion[.]" HRS § 707-700 (1993) defines "compulsion" as "absence of consent, or a threat, express or implied, that places a person in fear of public humiliation, property damage, or financial loss."

veteran of the Sex Crimes Detail, that probable cause existed for arresting Calara.  Such testimony was inadmissible under State v. Batangan, 71 Haw. 552, 799 P.2d 48 (1990), State v. Morris, 72 Haw. 527, 825 P.2d 1051 (1992), State v. Ryan, 112 Hawaiʻi 136, 144 P.3d 584 (App. 2006), and State v. Baron, 80 Hawaiʻi 107, 905 P.2d 613 (1995), because the testifier was imbued with an aura of expertise due to his experience, and because the testimony implied that the CW's version of the events was truthful and believable, thus invading the province of the jury.  This opinion briefly addresses the remaining questions presented to aid the circuit court on retrial.

With regard to the first question presented, we hold that the circuit court should have conducted a Hawaiʻi Rules of Evidence ("HRE") Rule 104 hearing to determine whether there was admissible evidence concerning the CW's alleged drug use and its effect upon her perception.  With regard to the fourth question presented, we hold that the circuit court should have excluded Calara's earlier statements that he wanted to "take" the CW because the statements were, at their core, character evidence used to show action in conformity therewith, and were not admissible under an HRE Rule 404(b) exception.  As such, it is not necessary to reach the fifth question presented, whether a limiting instruction should have accompanied the admission of the

3

statements.  Lastly, because we remand this case for a new trial, we need not, and do not, reach the third question presented: whether the ICA gravely erred in holding that the circuit court's error in admitting the CW's statements to her aunt as an excited utterance was harmless beyond a reasonable doubt.

## II.  Background

On June 23, 2008, Calara was charged by Complaint with "knowingly subject[ing the CW] to sexual contact by compulsion or [causing the CW] to have sexual contact with [him] by compulsion, thereby committing the offense of Sexual Assault in the Fourth Degree, in violation of Section 707-733(1)(a) of the Hawaii Revised Statutes."

The charges stemmed from an incident in the early morning hours of March 13, 2007 in which the CW, Calara's adult niece temporarily staying with the Calara family, accused Calara of entering her bedroom at night and fondling her breast without her consent.  Calara, on the other hand, denied that he sexually assaulted the CW, testifying that he was in his bedroom all night when the incident allegedly occurred.

### A.  Pre-Trial Motions in Limine

#### 1. Drug Pipe

Relevant to the first question presented, in a Notice of Intent to Use Evidence, Calara signaled his intent to introduce

at trial the following "evidence of other crimes, wrongs, or acts involving" the CW:

> d.  When packing up the Complainant's personal belongings on or about March 14, 2007, Mrs. Calara discovered a pipe in the room the Complainant had been using.  Mrs. Calara called HPD to do a test on the pipe.  The pipe had a bulb[o]us end and smelled "funny."  Previously, this room had only been used by [Calara's] nine-year old daughter.

The State filed its Motion in Limine to exclude evidence of the CW's prior bad acts.  The circuit court heard the pre-trial motions on December 2, 2008 and precluded the admission of the pipe into evidence, concluding the following:

> I think the evidence is so remote, so tangential and so unreliable as to whether or not this is [the CW's] pipe and whether she smoked it on March -- the early morning hours of March 13th, that the court should not allow this.
> It's more prejudicial than probative and it is really very -- shall I use the word -- flimsy evidence that right now, based on what you've presented, that this was her pipe and that she used it on or about the date of the alleged offense so that it has relevance to the allegations in this case.

Defense counsel then requested a HRE Rule 104 hearing to call Mrs. Calara to testify that she found the pipe within the CW's belongings, to call the CW to testify as to whether she used the drug pipe on March 13, 2007, and, if so, whether drug use affected her perception of the incident, arguing as follows:

> At the 104 hearing I'd be prepared to present my client's wife as a witness to testify exactly where she found [the pipe], in what belongings, because the only person using that room for four months was the complainant.  No one used the room after she left until they packed up her things. And it was found in her things. . . .  It's clear [the pipe] belonged to her.  At -- I think a 104 hearing is at least necessary to clarify that she was not under the influence -- or did not use that item on the date of this incident and affecting her perception.

5

The circuit court denied the request as follows:

> The court's ruling is that the 104 hearing is not going to
> be able to establish who used the pipe, when it was used,
> and therefore it has no relevance to the case.  And the fact
> that it involves marijuana, or at least -- I don't know what
> it involves, what kind of drug.  We don't know.  Only that
> it smelled funny -- is more prejudicial than probative.  I
> don't know what smelled funny means. . . .  And a 104
> hearing is not going to cure [the problem of what substance
> was in the pipe] because the HPD did not do a test on the
> pipe.

### 2. Police Testimony Regarding Probable Cause

Relevant to the second question presented, Calara's Motion in Limine also sought to exclude "references by HPD officers, to the effect that 'all elements' were met for an arrest/crime as irrelevant under HRE 403 and because such legally conclusive language invades the province of the jury."

The circuit court granted Calara's motion in limine and further ruled as follows:

> With regard to legally conclusive language as to HPD
> saying all elements of the crime were met, the court is
> going to grant the request.  However, the court is going to
> allow the prosecution to ask the question whether or not in
> the police officer's mind probable cause was met for an
> arrest to be made.
> And the reason for the court's ruling is to avoid any
> confusion in the jury's mind as to whether or not the
> standard of conviction is somehow less than proof beyond a
> reasonable doubt, which includes proving all the elements of
> the offense and not the standard for the arrest of any
> individual.

### 3. January and February 2007 Statements

Relevant to the fourth question presented, in a Notice of Intent to Use Evidence, the State signaled its intent to introduce at trial the following two statements "pursuant to

6

Hawaii Rules of Evidence Rule 404(b), as evidence of [Calara's] intent, motive, modus operandi and lack of mistake or accident . . . [but] not . . . to prove the character of the defendant or to show [Calara] acted in conformity with these other acts":

> 5.  In January 2007 in Hawaiʻi, [Calara] made sexual advances towards [the CW].  [Calara] said that he just wanted to grab and take [the CW].
> 6.  In February 2007 in Hawaiʻi, [Calara] again told [the CW] that [Calara] wanted to take her.

Calara filed a Motion in Limine to exclude the January and February 2007 statements as "unfairly prejudicial under HRE 404 and irrelevant under HRE 403. . . ."

The circuit court denied Calara's motion in limine to exclude the statements, stating the following:

> That the two events in question in January and February 2007, two prior events in question, [are] fairly close in time to the date of the alleged offense on March 13, 2007.
> And in the court's view what it goes to show is the state of mind of the defendant at the time.  It is apparent from these statements that [the CW] became the object of [Calara's] desire, and when you -- sexual desire, inappropriate as it was.  The fact that she rebuffed him, again, I would agree goes to the issue of lack of consent.
> And the intent I think is also demonstrated by the proffer that was made, and the court does agree that the prejudice -- prejudice to the defense and to the defendant is low.  It doesn't mean that he assaulted her prior to the events of March 13, 2007, only what his state of mind was, what his intent [was].
> I don't think it's a question so much of modus operandi as much as it is lack of consent, state of mind, and the fact that it shows that he had some sexual interest perhaps in the complaining witness.

### B.  Trial

#### 1.  Testimony of the CW

Trial commenced on December 3, 2008.  The State called the CW to testify first.  She testified that she returned to Hawaiʻi from the mainland in December 2006 with her two-and-a-half-year-old daughter and six-month-old son and stayed with Calara, his wife Debra, and their three children.  She stayed for three months in a bedroom formerly occupied by the Calaras' youngest child, a nine-year-old girl.

The CW testified that in January 2007, Calara "expressed an interest to develop a physical relationship" when he told her "he wanted to . . . grab and take [her]."  The CW understood this statement to mean "he wanted to have sex."  The CW testified she was not interested because "he was married to my aunt and [the CW was] not attracted to him."  She testified that she told Calara "that wasn't possible."  The CW testified that again in February 2007, Calara told her "[h]e wanted to take [her]," which she understood to mean "he wanted sex," and she again told him she was not interested and "blew him off and ignored him."  The CW testified that she did not know whether Calara was "serious" when he made both the January and February 2007 statements.  She also stated that she liked talking with her aunt Debra on a daily basis, and if Calara was not serious, she

8

did not want to "make a big deal out of it" or hurt Debra's feelings.

The CW testified that during the early morning hours of March 13, 2007, she was asleep in a bedroom that she shared with her two children. She awoke when she "felt something cold on [her] breast." She determined it was Calara's hand, which was "massaging" and "manipulating" her bare breast. The CW testified that she screamed and Calara "jumped back and . . . kept saying I'm sorry" and that he did not "know what [he] was thinking" three to four times. After about five to ten minutes of standing in the room and apologizing, Calara left the room. The CW testified she stayed up all night, in shock, and got out of bed later that morning at 6:00 a.m. to prepare for an 8:00 a.m. meeting with a First to Work counselor. The CW stated that she felt "very upset and betrayed and violated."

Calara and Debra drove the CW to her First to Work appointment. The CW did not recall confronting either of them with what had happened earlier that morning. The First to Work counselor was the first person to whom the CW disclosed what had happened. The CW then called her other aunt, Theresa, to pick her up from the First to Work appointment. She then disclosed the incident to Theresa. The CW also disclosed to Debra what had happened and was upset that Debra did not believe her. After

9

this conversation, the CW gave a statement to Honolulu Police Department ("HPD") Officer Enrico Domingo, and met with HPD Detective Fred Denault, with whom she identified Calara from a photographic line-up. The CW and her children then moved to Theresa's house.

### 2. Testimony of Theresa Nishite

The State then called Theresa Nishite (Debra's sister and the CW's aunt). Theresa testified that she picked the CW up from her First to Work appointment at around 11:00 a.m. or 12:00 p.m., and that the CW was "crying the whole time," "obviously very distraught," and "very upset." When asked by the State what the CW told Theresa, defense counsel objected on the ground of hearsay, and the State countered that the statement to be elicited was an excited utterance. The court sustained the objection as "needing more foundation." Theresa then testified that the CW's face was "all red and she had tears coming down her face" and was "gasping" and "having hard time talking" because she had been crying and "was in some kind of trouble." The circuit court decided to admit the statement as an excited utterance, reasoning as follows:

> [I]t seems to me that (unintelligible) of the startling event or incident and that this was the first opportunity that [the CW] had to tell somebody about it. She did not discuss it with anybody else from the time that the incident allegedly occurred of 2:30 in the morning.
> She testified that she -- previously testified that she woke with the intention of taking the bus but that she

10

> accepted the offer to drive her to the DHS office from the Calaras, and it was at that particular point that she saw her Aunt Theresa that she began to engage in this emotional outburst.
>
> And the court does believe that the sufficient foundation has been laid and that she made these utterances while still under the stress of the excitement caused by the event or condition.

The "excited utterance" eventually elicited from Theresa was the following:

> (Unintelligible) said that she went to sleep and that [Calara] had come into her bedroom and had touched her under her shirt and her kids were in the room and (unintelligible) while she was talking she was crying so she kind of (unintelligible) to kind of continue on but to the gist of it she just had mentioned that [Calara] had touched her while she was (unintelligible) -- when she was sleeping.

### 3.    Testimony of Officer Enrico Domingo

The State then called HPD Officer Enrico Domingo, who testified that the CW made a walk-in complaint, made a statement, and identified Calara as the person who touched her.

### 4.    Testimony of Detective Fred Denault

The State then called Detective Fred Denault, who testified that he interviewed the CW and showed her a photographic line-up, from which she picked out Calara as the person who touched her. Then the following exchange occurred with regard to "probable cause" for arresting Calara:

> Q [The State]:  So after you conducted the lineup, did you have probable cause to enri -- arrest Enrico Calara for misdemeanor sexual assault?
> A [Denault]:  Yes.
> Q:  And why is that?
> A:  Well, based on the --
> [Defense counsel]:  Objection, Your Honor.  Um, lack of foundation and irrelevant.
> The court:  I'll overrule the objection.  You may proceed.

11

Q [The State]:  So after you conducted the photo lineup, did you have probable cause to arrest Enrico Calara for misdemeanor sexual assault?
A:  Yes.
Q:  And why?
A:  Based on the complaint written by the complaining witness which included the offenses of sex assault in the fourth degree which involve sexual contact to another person without consent, and I affirmed her statement with her that day while conducting the photographic lineup, and she positively identified the suspect as Enrico Calara via photograph, and that then his identity was then confirmed regarding the possible suspect involved in this case there was probable cause established.
Q:  Thank you.
    And when you say you affirmed her statement, was that the written statement that she had given Officer Domingo?
A:  Yes.  I brought the report with me and then I had her review the statement to confirm that what's –- what she had written in that was the events that she was alleging.

The State then rested.

### 5.  Testimony of Debra Calara

The defense called as its first witness Debra Calara, Calara's wife, who testified that she and her teenage son were both working during the early morning hours of March 13, 2007 and were not home.

### 6.  Testimony of Kristy Calara

The defense called as its second witness Calara's eighteen-year-old daughter, Kristy Calara.  She testified that the night of the alleged incident, she had gone to her room around 9:00 p.m. and was still there and awake during the early morning hours of March 13, 2007.  Her bedroom was diagonally across from the CW's bedroom.  She testified that she, Calara, the Calaras' nine-year-old daughter, and the CW and her children were home, but

12

Debra and the Calaras' teenage son were at work. She testified that she did not hear Calara's or the CW's doors open or the CW scream at around 2:30 or 2:45 in the morning.

### 7. Testimony of Calara

The defense called Calara to testify last. Calara denied looking the CW up and down and stating to her that he wanted to "take her" in January and February 2007. He also testified that he had been in his bedroom from 9:00 p.m. on March 12, 2007 to 6:00 a.m. the following morning. He testified that he stayed in his bedroom all night and denied touching the CW's breast.

The jury returned a guilty verdict. Calara timely appealed.

### C. Appeal

On appeal, Calara raised the following points of error, which are similar to the questions presented on certiorari:

> 1. The circuit court erred by precluding the defense from introducing evidence of [the CW's] pipe used to ingest drugs and from cross-examining her as to her drug use to attack her perception and recollection.
> 2. The circuit court erred in admitting Detective Denault's testimony that probable cause was established to arrest Enrico Calara for sexual assault in the fourth degree.
> 3. The circuit court erred in admitting [the CW's] statement to Theresa Nishite as an "excited utterance."
> 4. The circuit court erred in admitting evidence of Enrico Calara's prior statements uttered in January 200[7] and February 200[7] to establish his intent.
> 5. The circuit court plainly erred in failing to provide a limiting instruction at the time of [the CW's] testimony regarding Enrico Calara's alleged prior statements and as part of the final charge to the jury.

The ICA concluded that Calara's appeal was "without merit" and affirmed his judgment of conviction and probation sentence.

13

State v. Calara, No. 29550 (App. Feb. 14, 2013)(SDO) at 2, 7. As to Calara's first point of error, the ICA concluded that the circuit court properly ruled that "the evidence is so remote, so tangential and so unreliable" as to whether the pipe belonged to the CW and as to whether she smoked it around the time of the incident that it was properly excluded and was more prejudicial than probative. Calara, SDO at 3. Citing State v. Sabog, 108 Hawaiʻi 102, 109-11, 117 P.3d 834, 841-43 (App. 2005), the ICA further held, "[T]he circuit court did not foreclose Calara from cross-examining CW regarding possible drug use on the day of the event." Id. Under Sabog, reasoned the ICA, "Calara was entitled to cross-examine CW as to whether any drug use affected her perception and recollection of the incident." Id.

As to Calara's second point of error, the ICA stated, "Calara did not object to this testimony at trial," and "Calara has not demonstrated that his substantial rights were affected by Denault's testimony." Calara, SDO at 3-4. The ICA then distinguished three cases cited by Calara, Batangan, 71 Haw. 552, 799 P.2d 48; Morris, 72 Haw. 527, 825 P.2d 1051; and Ryan, 112 Hawaiʻi 136, 144 P.3d 584, from the instant case on the basis that "all involved witnesses offering opinions on victim-complainants' credibility." Calara, SDO at 4 (footnote omitted).

14

The ICA further noted, "Denault's testimony, on the other hand, explained the events that led to Calara's arrest." Id.

As to Calara's third point of error, the ICA agreed with Calara that the circuit court should not have admitted Theresa's testimony about what the CW told her of the incident as an excited utterance, because the CW's statements "were too remote from the alleged sexual assault[,]" "neither spontaneous nor impulsive[,]" and "the result of reflection." Calara, SDO at 5. Nevertheless, the ICA held that the circuit court's error "was harmless beyond a reasonable doubt because it was cumulative of CW's and Denault's testimony at trial." Id. (citation omitted).

As to Calara's fourth point of error, the ICA held that Calara's January and February 2007 statements were admissible as "relevant to understanding [Calara's] state of mind, as well as CW's lack of consent," and that their probative value was not substantially outweighed by danger of unfair prejudice, confusion, or misleading the jury. Calara, SDO at 6.

As to Calara's fifth point of error, the ICA cited HRE Rule 105 to support its conclusion that Calara should have requested a limiting instruction. Calara, SDO at 7. The ICA also held that "Calara did not demonstrate the circuit court's failure to *sua sponte* provide a limiting instruction regarding CW's testimony impair[ed] his substantial rights." Id. (citation omitted).

15

## III. Discussion

### A. Police Testimony Regarding Probable Cause

As it forms the basis for our remand, Calara's second question presented is addressed first. Calara's second question presented is

> 2. Whether the ICA gravely erred in deciding the issue of whether the circuit court erred in admitting the police detective's testimony that probable cause was established to arrest Calara for sexual assault in the fourth degree under the plain error standard of review and in failing to hold that the testimony was irrelevant and improper.

As a preliminary matter, defense counsel did object to Denault's probable cause testimony, as the following transcript excerpt demonstrates:

> Q [The State]: So after you conducted the lineup, did you have probable cause to enri – arrest Enrico Calara for misdemeanor sexual assault?
> A [Denault]: Yes.
> Q: And why is that?
> A: Well, based on the --
> [Defense counsel]: <u>Objection, Your Honor. Um, lack of foundation and irrelevant.</u>
> The court: I'll overrule the objection. You may proceed.
> Q [The State]: So after you conducted the photo lineup, did you have probable cause to arrest Enrico Calara for misdemeanor sexual assault?
> A: Yes.

The ICA should not have reviewed the admissibility of Denault's probable cause testimony under the plain error standard.[3]

---

[3]    Even if it could be said that defense counsel's objection did not properly preserve the error (*i,e.*, because the basis for the objection differed from the point of error raised on appeal), under a plain error standard of review, Denault's probable cause testimony nevertheless affected Calara's substantial rights. <u>Ryan</u>, 112 Hawaiʻi at 141, 144 P.3d at 589 ("We also conclude that the error in permitting the officers to testify about the CW's credibility in accusing [the defendant] affected [the defendant's] substantial rights.") The <u>Ryan</u> line of cases is discussed in greater detail further in this section.

16

Further, the ICA did not adequately distinguish Batangan, Morris, and Ryan from the instant case.  The ICA stated only that those cases "all involved witnesses offering opinions on victim-complainants' credibility."  Calara, SDO at 4.  That distinction is not entirely true.  In those cases, the expert witnesses (or those witnesses with an aura of expertise) did not directly "offer[] opinions" about a victim-complainant's credibility, yet their testimony had that effect.  Those cases are discussed in greater detail, next.

In Batangan, 71 Haw. at 555, 799 P.2d at 50, an expert witness (a clinical psychologist with a subspecialty in the treatment of sexually abused children) testified that he interviewed the complainant (a very young child) and explained "how he evaluates whether a child is telling the truth about being sexually assaulted."  The expert then "implicitly testified that Complainant was believable and that she has been abused by Defendant."  Id. (emphasis added).  Even though the expert witness "did not explicitly say that Complainant was 'truthful' or 'believable,'" we held, "there is no doubt in our minds that the jury was left with a clear indication of his conclusion that Complainant was truthful and believable."  71 Haw. at 563, 799 P.2d at 54.

17

In Morris, 72 Haw. at 529, 825 P.2d at 1052, an expert witness, who "had no physical evidence [of chronic sexual abuse] whatsoever," opined that the child complainant was chronically sexually abused. This court held his opinion "had to have been based on the child's statements to others. This is one of those cases like Batangan where, although the expert witness does not say that the child is truthful, or that he believes the child, the clear implication of his testimony is just that, and the admission of that testimony in this case was reversible error." Id. (emphasis added).

In Ryan, this court extended Batangan's expert witness holding to situations in which non-experts (here, responding police officers) implicitly concluded a complaining witness was credible. 112 Hawaiʻi at 141, 144 P.3d at 589 ("The Hawaiʻi Supreme Court's reasons for condemning the expert's testimony in Batangan applies to the officers' testimony in Ryan's case.") This was because "[t]he emphasis on the officers' training and experience in domestic violence cases served to give the officers an aura of being experts in evaluating the truthfulness of statements made by an alleged victim in domestic violence cases." Id. Also, in Ryan (like in Batangan and Morris), the responding officers gave no direct opinion supporting the complainant's credibility, yet this court held that their testimony had that

18

effect.  The deputy prosecutor "did not directly ask [the responding officers] for their opinion on whether the CW had told them the truth."  Id.  Rather, the "questions posed to the officers were couched in terms of whether they had any reason or evidence that would cause them not to believe the CW's allegations against [the defendant]."  Id.  This court held, "[G]iven the DPA's repeated questioning on this subject and the context in which the questions were asked, the only purpose served by the questioning was to inject into the trial the officers' opinion that the CW's allegations were true. . . . Viewed in context, the effect of the officers' testimony was the same as a direct expression of their opinion that the CW had told them the truth."  Id. (emphasis added).

Similarly, in Baron, 80 Haw. at 116, 905 P.2d at 622, we concluded that the screening prosecutor's testimony that she decided to bring charges against the defendant meant the screening prosecutor "impliedly found the complainant's allegations to be truthful."  We noted that, in a case concerning the credibility of the complainant, "the testimony of the [screening prosecutor] unfairly influenced the jury."  Id.

In short, Hawaiʻi appellate courts have held that such implicit conclusions about a complaining witness's testimony should be precluded.  See Batangan, 71 Haw. at 558, 799 P.2d at

19

52 ("[C]onclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable is of no assistance to the jury, and therefore, should not be admitted. Such testimony is precluded by HRE Rule 702.")(emphasis added); Ryan, 112 Hawaiʻi at 141, 144 P.3d at 589 ("Accordingly, under the circumstances of this case, we hold that the family court abused its discretion in permitting [the responding officers'] testimony."); Baron, 80 Haw. at 116, 905 P.2d at 622 ("[W]e hold that the trial court abused its discretion by not precluding the testimony of [the screening prosecutor].").

Preclusion is necessary because this type of testimony invades the province of the jury by usurping its power to make credibility determinations. See Batangan, 71 Haw. at 559, 799 P.2d at 52 ("The expert's use of words such as 'truthful' and 'believable' is not talismanic. But where the effect of the expert's opinion is 'the same as directly opining on the truthfulness of the complaining witness,' such testimony invades the province of the jury.")(citation omitted; emphasis added); Ryan, 112 Hawaiʻi at 141, 144 P.3d at 589 ("We conclude that the officers' testimony, which was tantamount to an expression of their opinion that the CW had been truthful in accusing [the defendant], impermissibly invaded the province of the jury.")(citation omitted; emphasis added).

20

Admission of this type of testimony provides grounds for vacating a conviction.  See Morris, 72 Haw. at 529, 825 P.2d at 1052 ("[T]he admission of [implicit expert testimony that the complainant was truthful or believable] in this case was reversible error. . . . Accordingly, we vacate the judgment below and remand the case for a new trial.")(emphases added); Baron, 80 Haw. at 116, 905 P.2d at 622 ("The prejudice to Appellant is patently clear and warrants a reversal in this case.  We therefore vacate the guilty verdicts and remand the case to the circuit court for a new trial.")(emphases added).

In the instant appeal, like in Batangan, Morris, Ryan, and Baron, Denault did not directly testify that he found the CW credible, but his testimony had that effect.  He testified to the following:

> Q [BY THE STATE]:  So after you conducted the photo lineup, did you have probable cause to arrest Enrico Calara for misdemeanor sexual assault?
> A [BY DENAULT]:  Yes.
> Q:  And why?
> A:  Based on the complaint written by the complaining witness which included the offenses of sex assault in the fourth degree which involve sexual contact to another person without consent, and I affirmed her statement with her that day while conducting the photographic lineup, and she positively identified the suspect as Enrico Calara via photograph, and that then his identity was then confirmed regarding the possible suspect involved in this case there was probable cause established.
> Q:  Thank you.
>      And when you say you affirmed her statement, was that the written statement that she had given Officer Domingo?
> A:  Yes.  I brought the report with me and then I had her review the statement to confirm that what's – what she had written in that was the events that she was alleging.

21

Denault, a 26-year veteran of HPD assigned to the Sex Crimes Detail, was imbued with "an aura of expertise" like the responding officers in Ryan. Thus, when he testified that his decision to arrest Calara was based on his assessment that the CW's allegations provided him with probable cause, such testimony "was tantamount to an expression of [his] opinion that the CW had been truthful in accusing" Calara. Ryan, 112 Hawaiʻi at 141, 144 P.3d at 589.

Further, the circuit court's contemplated cure for admitting such testimony does not appear on the record and would not change this result. At the hearing on the motions in limine, the circuit court explained that it would allow the testimony under the following circumstances:

> With regard to legally conclusive language as to HPD saying all elements of the crime were met, the court is going to grant the [defense's] request [to exclude legally conclusive language]. However, the court is going to allow the prosecution to ask the question whether or not in the police officer's mind probable cause was met for an arrest to be made.
> And the reason for the court's ruling is to avoid any confusion in the jury's mind as to whether or not the standard of conviction is somehow less than proof beyond a reasonable doubt, which includes proving all the elements of the offense and not the standard for the arrest of any individual.

The jury was not provided with any instruction regarding the difference between probable cause and proof beyond a reasonable doubt. Therefore, as Calara argued, in addition to Denault's testimony invading the province of the jury by bolstering the

CW's credibility, there was also a possibility that the jury overly weighted the probable cause testimony in its reasonable doubt determination, and this may have contributed to Calara's conviction.

The ICA also concluded that Denault's testimony merely "explained the events that led to Calara's arrest." Calara, SDO at 4. However, this court previously rejected a similar argument in Ryan. In that case, the State argued that the responding officers' opinions "were directed more toward the completeness of the police investigation." 112 Hawaiʻi at 141, 144 P.3d at 589. We disagreed, because "[t]he defense did not attack the actions of [the responding officers] or the thoroughness of the HPD's investigation." Id. Similarly, in this case, Calara never attacked the probable cause determination. We concluded in Ryan, "The context in which the officers were questioned convinces us that the officers' testimony was directed at whether they believed the CW was truthful in her allegations and not at the thoroughness of their investigation." Id. So, too, was Denault's testimony that the CW's statement provided him with probable cause to arrest Calara: his statement implied he believed the CW's allegations.

In short, Denault's probable cause testimony should have been precluded under Batangan, Morris, Ryan, and Baron. The

23

admission of the probable cause testimony was an abuse of discretion. Therefore, we vacate the ICA's judgment on appeal, vacate the circuit court's judgment of conviction and probation sentence, and remand Calara's case to the circuit court for retrial.

We address the remaining issues raised by Calara to the extent necessary to resolve this appeal and to assist the circuit court on retrial.

**B.     Preclusion of Evidence of Drug Pipe**

On certiorari, Calara's first question presented is

> 1.  Whether the ICA gravely erred in holding that Calara's right to present a complete defense was not violated when the circuit court precluded him from introducing evidence of the complainant's drug pipe and by cross-examining the complain[an]t about her drug use for the purposes of attacking her perception and recollection.

In his Notice of Intent to Use Evidence, Calara signaled his intent to introduce at trial as "evidence of other crimes, wrongs, or acts involving" the CW a pipe found in the room occupied by the CW by Mrs. Calara. His counsel requested a HRE Rule 104 hearing as follows:

> At the 104 hearing I'd be prepared to present my client's wife as a witness to testify exactly where she found [the pipe], in what belongings, because the only person using that room for four months was the complainant. No one used the room after she left until they packed up her things. And it was found in her things. . . . It's clear [the pipe] belonged to her. At -- I think a 104 hearing is at least necessary to clarify that she was not under the influence -- or did not use that item on the date of this incident and affecting her perception.

24

The circuit court denied the request as follows:

> The court's ruling is that the 104 hearing is not going to be able to establish who used the pipe, when it was used, and therefore it has no relevance to the case.  And the fact that it involves marijuana, or at least -- I don't know what it involves, what kind of drug.  We don't know.  Only that it smelled funny -- is more prejudicial than probative.  I don't know what smelled funny means. . . .  And a 104 hearing is not going to cure [the problem of what substance was in the pipe] because the HPD did not do a test on the pipe.

The circuit court erred in deciding that a HRE Rule 104 hearing was not necessary.  HRE Rule 104 provides, in relevant part:

> **Preliminary questions.**
> (a) Questions of admissibility generally.  Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b).  In making its determination the court is not bound by the rules of evidence except those with respect to privileges.
> (b)  Relevancy conditioned on fact.  When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition. . . .

The circuit court focused solely on the pipe evidence in denying the HRE Rule 104 hearing, finding the evidence inadmissible as irrelevant because the pipe had not been tested.  The effect of the denial of the HRE Rule 104 hearing was broader, however, in that it precluded any evidence of drug use as potentially relevant to the CW's perception of the alleged event.  As such, the circuit court's decision was inconsistent with Saboq, 108 Hawaiʻi at 111, 117 P.3d at 843, which held a defendant is

25

entitled to cross-examine a witness concerning the witness's "drug use and addiction at or near the time of the incident to the extent that it affected [the witness's] perception or recollection of the alleged event. . . ." A HRE Rule 104 hearing would have allowed the circuit court to determine whether there was any evidence relevant to the issue of the CW's purported drug use as affecting her perception.

## C. Excited Utterance

On certiorari, Calara's third question presented is

> 3. Whether the ICA gravely erred in concluding that the admission of CW's statement to Theresa Nishite as an "excited utterance" was harmless beyond a reasonable doubt.

We agree with the ICA that the CW's statement to Theresa Nishite was not an excited utterance and should not have been admitted into evidence. Calara, SDO at 5. As we are remanding this case for retrial based on the circuit court's admission of Denault's probable cause testimony, we need not, and do not, reach the issue of whether the ICA gravely erred in holding that the admission of the statement as an excited utterance was harmless beyond a reasonable doubt.

## D. January and February 2007 Statements

On certiorari, Calara's fourth question presented is

> 4. Whether the ICA gravely erred in concluding that the evidence of Calara's prior statements uttered in January 200[7] and February 200[7] to establish his intent were relevant.

26

The two prior statements Calara uttered in January and February 2007 were that he wanted to "take" the CW, statements which the CW believed indicated Calara's sexual interest in her. Via motion in limine, Calara sought to have the statements excluded as "unfairly prejudicial under HRE 404 and irrelevant under HRE 403. . . ." The circuit court denied the motion in limine as follows:

> That the two events in question in January and February 2007, two prior events in question, [are] fairly close in time to the date of the alleged offense on March 13, 2007.
> And in the court's view what it goes to show is the state of mind of the defendant at the time. It is apparent from these statements that [the CW] became the object of [Calara's] desire, and when you –- sexual desire, inappropriate as it was. The fact that she rebuffed him, again, I would agree goes to the issue of lack of consent.
> And the intent I think is also demonstrated by the proffer that was made, and the court does agree that the prejudice –- prejudice to the defense and to the defendant is low. It doesn't mean that he assaulted her prior to the events of March 13, 2007, only what his state of mind was, what his intent [was].
> I don't think it's a question so much of modus operandi as much as it is lack of consent, state of mind, and the fact that it shows that he had some sexual interest perhaps in the complaining witness.

In short, the circuit court admitted the statements under HRE Rule 404(b) for the purpose of showing Calara's state of mind or intent, and the CW's lack of consent. None of these purposes supported the admission of the statements under HRE Rule 404(b), however. Instead, the statements, at their core, tended to prove the character of Calara in order to show action in conformity therewith, and should have been excluded.

27

HRE Rule 404(b) states, in relevant part

> Other crimes, wrongs, or acts. Evidence of other crimes,
> wrongs, or acts is not admissible to prove the character of
> a person in order to show action in conformity therewith.
> It may, however, be admissible where such evidence is
> probative of another fact that is of consequence to the
> determination of the action, such as proof of motive,
> opportunity, intent, preparation, plan, knowledge, identity,
> modus operandi, or absence of mistake or accident. . . .

"[W]hen evidence of other crimes, wrongs, and acts is offered by the prosecution, the problem for the trial court is one 'of classifying and then balancing[, if necessary]. . . the prejudicial impact of the evidence [with] its probative worth." State v. Castro, 69 Haw. 633, 644, 756 P.2d 1033, 1041 (1988)(first set of brackets in original; second set of brackets added). "If its purpose is only 'to show some propensity to commit the crime at trial, there is no room for ad hoc balancing. The evidence is then unequivocally inadmissible[.]'" Id. See also Addison M. Bowman, Hawaiʻi Rules of Evidence Manual (2012-2013) at 4-49 ("[I]f a fact of consequence other than character cannot be identified, then the evidence has no legitimate probative value.")

In this case, the statements were not probative of any other fact that was of consequence to Calara's case. Specifically, they were not probative of Calara's state of mind or intent, or the CW's lack of consent. Reviewing the record, it is clear that Calara's defense was he did not do the act; he testified that he

28

remained in his bedroom all night and did not enter the CW's bedroom, where she alleged the sexual assault took place. The CW's consent was never at issue. Therefore, the circuit court abused its discretion in admitting the January and February 2007 statements to show the CW's lack of consent.

The district court also abused its discretion in admitting the January and February 2007 statements to show Calara's state of mind or intent. Intent is "the state of mind with which an act is done. . . ." State v. Torres, 85 Hawaiʻi 417, 422, 945 P.2d 849, 854 (App. 1997)(citation omitted). "Because mens rea is an element of the prosecution's case-in-chief, in most criminal cases, the intent inferences of rule 404(b) require analytical rigor." Bowman, Hawaiʻi Rules of Evidence Manual (2012-2013) at 4-53. "Without the necessity that arises when a mental defense is interposed to a criminal charge, admission of 'other crimes' to prove intent is strongly suspect because intent, although elemental, is subsumed within the charged acts and typically stands or falls with the proof of them." Id.

In this case, Calara did not put his intent in issue in the way a defendant arguing that a touching was due to mistake, accident, or some other innocent explanation would. Again, Calara's defense was that he was not in the CW's room, so the touching simply did not occur. Thus, Calara's case can be

distinguished from two factually similar cases in which the defendant's prior sexually inappropriate comments were properly admitted under HRE Rule 404(b) to show intent:  Torres, 85 Hawaiʻi 417, 945 P.2d 849, and State v. Mars, 116 Hawaiʻi 125, 170 P.3d 861 (App. 2007).

In Torres, 85 Hawaiʻi at 418-19, 945 P.2d at 850-51, the defendant was convicted of sexual assault in the first degree for having inserted his finger into his nine-year-old niece's vagina while he was bathing her.  On appeal, the defendant claimed that the circuit court abused its discretion in admitting evidence regarding four prior bad acts, one of which was evidence that the defendant told the complainant "to find a place to make love[.]" 85 Hawaiʻi at 422, 945 P.2d at 854 (brackets in original).  The ICA concluded that the statement was relevant and probative to show the defendant's motive and intent to later sexually assault the complainant in the bathtub.  Id.  The defendant had testified at trial that "he 'had no bad intentions' when he agreed to bathe Complainant and wash her vagina.  He also vehemently denied ever digitally penetrating her vagina." Id.  The complainant, on the other hand, testified that when she and the defendant were alone at home, the defendant told her to put her leg up in the bath, inserted his finger in her vagina, at which point, the Complainant said, "Ouch," and the defendant told her not to tell

anybody.  85 Hawaiʻi at 419-20, 945 P.2d at 851-52.   The ICA

stated, "In this case, it was undisputed that Defendant washed

Complainant's vagina.  However, there was a dispute regarding who

prompted the bath and what occurred during the bath.

Consequently, evidence of why Defendant bathed Complainant--

*i.e.*, Defendant's motive, purpose, and intent for washing

Complainant's vagina-- were undoubtedly relevant to prove a fact

of consequence, that Defendant "*knowingly* subjected [Complainant]

to sexual penetration[.]"  85 Hawaiʻi at 422, 945 P.2d at 854

(emphasis in original).

In Mars, 116 Hawaiʻi at 128, 170 P.3d at 864, a defendant

was convicted of three counts of sexual assault in the first

degree for having had oral and anal sex with a fifteen-year-old

boy while both were in a bathroom.  On appeal, the defendant

argued that the circuit court abused its discretion in admitting

the following prior statements the defendant made to the fifteen-

year-old boy:  (1) that the boy should "pull up [his] pants and

not show [his] underwear because there were 'perverts' in the

area"; (2) that "he should be careful about his underwear because

the intermediate school students 'liked them'"; (3) that the boy

was "largely hung and a lot of people would like that"; and (4)

that the boy "had too much hair down there."  116 Hawaiʻi at 129, 170 P.3d at 865.

At trial, the fifteen-year-old boy testified that the defendant entered the bathroom while the boy was in the Jacuzzi, indicated that he wanted to have sex with the boy (as the two had done before), and the boy complied.  116 Hawaiʻi at 130, 170 P.3d at 866.  The defendant, on the other hand, testified that he had the runs and needed to use the nearest bathroom (the one that, unbeknownst to the defendant, was occupied by the boy at the time).  116 Hawaiʻi at 131, 170 P.3d at 867.  The defendant testified that he entered the unlocked bathroom, sat on the toilet, then saw the boy's head peek out of the Jacuzzi.  Id. The defendant denied sexually assaulting the fifteen-year-old boy.  Id.  The ICA concluded that the reasoning in Torres was directly applicable to the defendant's case.  116 Hawaiʻi at 141, 170 P.3d at 877.  It held the defendant's comments were relevant to show the defendant's motive, purpose, and intent when he joined the fifteen-year-old boy in the bathroom when the assaults took place, and were thus admissible under HRE Rule 404(b).  Id.

This case is distinguishable from Torres and Mars.  In Torres and Mars, both defendants denied sexually assaulting the complaining witnesses, and both defendants offered explanations

32

for why they were in the bathroom with the complaining witnesses. In doing so, they put at issue their motive and intent for being in the location where the sexual assaults took place. Therefore, prior inappropriate sexual statements made by both defendants to the minor complaining witnesses were admissible under HRE Rule 404(b) as "probative of another fact that is of consequence to the determination of the action," *i.e.*, countering the defendants' innocent explanations as to why they were alone with their bathing and vulnerable minor complaining witnesses, and tending to show that they knowingly touched the complaining witnesses.

No similar circumstances exist in this case, where Calara did not concede that he was in the CW's bedroom for some innocent reason when the alleged touching occurred, such that evidence of the prior statements would be probative of a fact of consequence, *i.e.*, the state of mind or intent tending to explain his presence in her bedroom and tending to explain the touching. Therefore, the circuit court abused its discretion in admitting the January and February 2007 statements under HRE Rule 404(b) as bearing on Calara's state of mind or intent.

### E.   The Absence of a Limiting Instruction

On certiorari, Calara's fifth question presented is

> 5.   Whether the ICA gravely erred in holding that the
> circuit court's failure to provide a limiting instruction at

33

the time of CW's testimony regarding Calara's alleged prior statements and as part of the final charge to the jury was not plain error.

Our holding that the January and February 2007 statements should not have been admitted under HRE Rule 404(b) obviates the need to reach the issue of whether the circuit court should have issued a limiting instruction to the jury as to the purposes for which those statements were to be used.

## IV. Conclusion

We hold (1) that the circuit court abused its discretion by admitting the testimony of the police detective that probable cause existed for arresting Calara because such testimony was inadmissible under Batangan, 71 Haw. 552, 799 P.2d 48; Morris, 72 Haw. 527, 825 P.2d 1051; Ryan, 112 Hawaiʻi 136, 144 P.3d 584; and Baron, 80 Hawaiʻi 107, 905 P.2d 613; (2) that the circuit court should have conducted a HRE Rule 104 hearing to determine whether there was admissible evidence concerning the CW's alleged drug use and its effect upon her perception; (3) that the circuit court should have excluded Calara's earlier statements that he wanted to "take" the complaining witness because the statements were, at their core, character evidence used to show action in conformity therewith, and were not admissible under an HRE Rule 404(b) exception; as such, (4) it is not necessary to reach the issue of whether a limiting instruction should have accompanied

34

the admission of the statements; and (5) because we remand this case for a new trial, we need not, and do not, reach the issue of whether the ICA gravely erred in holding that the circuit court's error in admitting the CW's statements to her aunt as an excited utterance were harmless beyond a reasonable doubt.  We vacate the ICA's Judgment on Appeal, vacate the circuit court's judgment of conviction and probation sentence, and remand this case to the circuit court for retrial.

Jason Z. Say                          /s/ Simeon R. Acoba, Jr.
for petitioner
                                      /s/ Sabrina S. McKenna
Stephen K. Tsushima
for respondent                        /s/ Richard W. Pollack

